## In re VAN ALSTYNE'S ESTATE.

(Supreme Court, Appellate Division, Third Department. June 28, 1901.)

1. EXECUTORS AND ADMINISTRATORS—ACCOUNTING—ATTORNEY'S FEES—LIABILITY OF EXECUTORS.

When an attorney is employed on a difficult estate, involving over $150,000, for a period of seven years, and tries many cases successfully, and is required to do much work, an allowance of $3,100 by the executor in payment of such fees and certain expenses of the attorney is not excessive, though, with the fees paid other attorneys, it makes a total amount of $10,000.

2. SAME—FAILURE TO COLLECT DEBTS.

Where executors are in possession of a note in favor of testator on a debtor in failing circumstances, but who promises to pay if suit is not brought, and bankers and legatees insist that it would be useless to bring suit thereon, and judgments on other claims against the debtor are not collected, the executors are not chargeable for the failure to collect such note.

3. SAME.

Where a debt due an estate from a debtor who is largely indebted is secured by a second mortgage on a farm, and the legatees advise the executors that the debtor is not personally responsible, the executors are not liable for a loss in settling such debt by taking the farm subject to the first mortgage in payment thereof, which is believed by the executors and others to be nearly sufficient to pay the debt, though they are forced to sell it at a loss.

4. SAME.

Executors who fail to file a claim against the estate of a debtor are liable for a loss of the claim, or portion thereof, resulting from such neglect.

5. SAME.

Where a debtor conveys a farm to the executors in settlement of the debt, and the son of the debtor afterwards purchases the farm, and

makes a voluntary payment to the executors in excess of the agreed
price, the executors are not entitled to set off such payment against a
loss resulting from their neglect in failing to present another claim
against the debtor's estate.

Appeal from surrogate's court, Columbia county.

Application by J. Spencer Hosford and another, as executors of
the estate of Barent Van Alstyne, deceased, for the settlement of
their accounts. From a decree settling the accounts, Henry Snyder
and others appeal. Modified and affirmed.

Appeal by Henry Snyder and others, children of Theodore Snyder, de-
ceased, who was a legatee under the last will and testament of Barent Van
Alstyne, deceased, and entitled to share in the distribution of his estate, and
by Calvin Ackley, as executor, etc., of said Theodore Snyder, deceased, from
a decree of the surrogate's court of the county of Columbia dated the 19th
day of October, 1900, and entered in the surrogate's office of the county of
Columbia on that day, settling the accounts of J. Spencer Hosford and Ed-
ward P. Van Alstyne as executors, etc., of Barent Van Alstyne, deceased.
Barent Van Alstyne died on the 7th day of May, 1886, leaving a last will and
testament, which was duly admitted to probate by the surrogate of the county
of Columbia on the 24th day of May, 1886; and letters testamentary thereon
were duly issued to said J. Spencer Hosford and Edward P. Van Alstyne, the
executors therein named. An inventory of the personal property of the de-
ceased was made by appraisers duly appointed, which inventory is dated
June 3, 1886, and was filed in the surrogate's office June 22, 1895. The total
amount of such inventory was $157,338.39; the amount unpaid on bonds,
mortgages, notes, and other securities being stated without a specific state-
ment by the appraisers of the amount collectible on each security, as re-
quired by statute. The property of the testator was on the 6th day of No-
vember, 1886, appraised, pursuant to the provisions of the act taxing gifts,
legacies, and collateral inheritances, and, as thus appraised, amounted to
$175,811.74. Theodore Snyder, a nephew of the deceased, and as such entitled
to one-fifth of his residuary estate, died on the 22d day of July, 1887, leaving
a last will and testament, which was admitted to probate by the surrogate
of Columbia county August 8, 1887; and letters testamentary thereon were
issued to Calvin Ackley, the executor therein named. The said Theodore
Snyder also left, him surviving, five children, who, together with said Calvin
Ackley, as executor as aforesaid, are the appellants herein. None of the
parties interested in the estate of the testator took any proceedings to
compel the executors to account. The executors commenced this proceeding
for an accounting in 1895, and duly filed their account in the surrogate's
court of Columbia county on the 22d day of June, 1895. No objections to
said account were filed by any of the parties interested in said estate, except
by said Ackley as executor as aforesaid, and by the said children of Theo-
dore Snyder, deceased. The account and objections were by the surrogate
referred to a referee to hear and determine the same as provided by the Code
of Civil Procedure, and the said referee heard the proofs relating thereto,
and made his report thereon to the said surrogate; and a decree was en-
tered confirming said report and settling the account of the said executors
on the 31st day of December, 1896. An appeal was taken by the appellants
herein to this court, and the opinion handed down on the decision thereof
is reported in 27 App. Div. 427, 50 N. Y. Supp. 550. The order as stated at
the end of the opinion was subsequently amended so as to reverse the de-
cree and grant a new trial upon the payment of costs absolutely by the
executors. The account and objections, together with a supplemental ac-
count and objections thereto, were referred by the surrogate to a new referee
to hear and determine the same, as before, and said referee heard the proofs
thereon, and reported to the surrogate in favor of the executors; and a decree
was entered confirming said report and settling the accounts of said ex-
ecutors on the 19th day of October, 1900, from which decree this appeal is
taken. The only three questions necessary for us to consider are stated by
counsel for the appellants as follows: "First. As to the allowance of ex-

cessive sums by way of counsel fees to William H. Atwood, who was attorney for the executors during a considerable period of the time, in connection with allowances for counsel fees to John Cadman and to Cadman & Peck; these allowances aggregating about ten thousand dollars. Second. As to whether the executors shall be allowed the sum of about $13,000 and interest by reason of failure to collect that amount on notes held and indorsed by the testator as against one John Raeder; the total indebtedness of Raeder to the estate aggregating, directly and indirectly, about $18,000; the executors having realized only about $5,000, for which sum they held a mortgage as collateral. Third. Whether the executors shall be allowed a loss of $11,000, with interest from a date previous to the death of testator, in 1886, on a note made by Charles and Mary A. Wild, upon which nothing was realized, although Wild still continued to do business up to 1889, while his wife was shown to have been in possession of sufficient personal property to have enabled the executors to realize the full sum of this note."

Argued before PARKER, P. J., and KELLOGG, EDWARDS, SMITH, and CHASE, JJ.

G. S. Collier and J. Newton Fiero, for appellants.
John Cadman, for respondents.

CHASE, J. All of the objections made to the decree herein, except so far as they relate to payments subsequent to the filing of the first account, were made to the decree of 1896, and were considered and passed upon by this court on the first appeal. Unless the testimony produced on the retrial changes the facts as they were then presented, we should adhere to the opinion then expressed.

The executors paid one Atwood, an attorney, for services and disbursements in foreclosing mortgages in cases where the estate was obliged to purchase the property on the sale, the sum of $1,492.81; being his actual disbursements therein and the taxable costs in such several cases. They also paid him the taxable costs and disbursements in another case on appeal, amounting to $64.50; also for disbursements and general services rendered to the executors during a period of about seven years and three months the sum of $3,100; making a total payment to the said Atwood of $4,657.31; and during the same time they paid to other counsel employed in the trial of litigated cases the sum of $1,879.25. Since the filing of the first account the executors have also paid their present attorneys and counsel for services and disbursements allowed by the surrogate's court the sum of $1,981, which sum includes their services and disbursements in litigated cases, and an allowance of $750 made to them by the surrogate's court on the first accounting herein. It now appears that $272.01 of the amount paid said Atwood for the foreclosure of mortgages was for services and disbursements, substantially all of which were rendered and incurred prior to the death of the testator, and that $243.50 thereof was for costs and disbursements in one case which were repaid to the executors on a transfer of the claim in suit shortly after such costs and disbursements had been paid by them to said Atwood. On the former appeal the court said:

"We think that the charges in the bill of Atwood for the amount of taxed bills of costs in the several actions to foreclose mortgages were sufficiently proved on the accounting."

There is nothing in the evidence now before us to require a change in the conclusion then reached. Atwood had been the counsel for the testator for ten years prior to his death, and during the last four or five years of the testator's life he was at the office of Atwood almost daily, in consultation with him about matters relating to his property. After the death of the testator the executors found many of his papers in the possession of Atwood, and they employed him as their attorney and counsel; and he continued as such attorney and counsel from the death of the testator down to the latter part of August, 1893, when he removed from the state. It was an unusually difficult estate to manage, and it was necessary that much time and attention should be given to it by the attorney and counsel for the executors. The charge for general services includes the proof of the will; the appraisal of the estate; the proceedings under the act to tax gifts, legacies, and collateral inheritances; and the bringing and defending of very many actions, several of which consumed many days in taking testimony, and one of which was appealed to and argued in the late general term of this court. Claims amounting to several thousand dollars were presented against the estate, and rejected by the executors. All of the litigated cases, including those against the estate as well as those in behalf of the estate, with a single exception, resulted favorably to the estate. The executors were in consultation with their attorney very frequently during the time he was retained by them. He assisted them in many sales of property; drew deeds, contracts, and other papers for them; and expended from $150 to $250 for traveling and other expenses, which are included in the said amount of $3,100. Although three payments on account of the claim of Atwood, namely, $100, $2,000, and $500, were paid without an itemized bill for the services rendered, yet the executors had knowledge of the services rendered, and the extent of the same; and subsequently, and before the first account was filed in the surrogate's court, a bill was rendered by Atwood to the executors, and the same was considered by them, and an accounting and settlement were had between the executors and the said Atwood, and the last payment of $500, charged by them to the estate, and making the total of the amount hereinbefore mentioned, was paid in full settlement and satisfaction of the claim of the said Atwood. Such payment was $905 less than the amount of the bill rendered to the estate by the said Atwood, and to which he claimed he was entitled. The contestant Ackley, in his testimony herein, admits that after all of the payments were made to Atwood, except the said balance of $500, he talked with one of the executors about the bill, and he says: "I told him I thought it would be a good thing if he could settle for $100, and get rid of him. That is what I approved." This statement was made by appellant when Atwood had been actually paid $4,157.31. At that time there was an agreement between Atwood and one Cook and the executors to turn a judgment that the executors held against said Cook towards the payment of rent owing by Atwood to said Cook, and this agreement was then known to the witness Ackley. Soon thereafter the settlement was made between the executors and Atwood, by which settlement the executors credit-

ed themselves with $500, although only $100 thereof was actually paid in cash to said Atwood; the balance of $400 being paid, pursuant to said agreement, by canceling the judgment of $400 that the executors held against the said Cook, and the amount thereof was credited by said Cook on account of his said claim against the said Atwood. The referee and the surrogate's court have approved the items paid for counsel fees, and the record contains evidence to sustain the findings relating thereto.

At the time of the death of the testator, he held a note of $11,000, made by Charles Wild and Mary A. Wild, his wife, dated January 19, 1882, payable one year from date, on which payments had been made on account of interest, leaving then unpaid the principal thereof, and between two and three years' interest on the same. The National Union Bank of Kinderhook at that time held a note made by said Charles Wild for $7,500, indorsed by the testator. For some time previous to the death of the testator the $11,000 note had been in the hands of his attorney, and an effort had been made by him and by the testator to have the same secured or reduced. The only payments obtained thereon were small payments on account of interest, as stated. Charles Wild was a cotton manufacturer, and the evidence received on the last trial in regard to his property and the property of Mary A. Wild is substantially the same as the evidence received on the previous trial herein. The executors, and each of them, called on the said Wild and his wife in regard to said indebtedness soon after the probate of the will of the testator, and as frequently as once in two months thereafter until the failure of the said Wild and of his wife. The result of the efforts so made by the executors was that on April 2, 1838, they obtained a mortgage on the homestead property owned by Mary A. Wild, as security for the $7,500 note so indorsed by the testator, and subsequently the property covered by said mortgage was sold for the amount of such note, and the same was paid, and the estate relieved from its liability thereon. Nothing was collected on the $11,000 note. When the executors first called on said Wild, he stated that he would try and provide for the note indorsed by the testator, by getting some one else on it, and, as soon as he could thereafter, would talk about the $11,000 note. When the mortgage was given as collateral to the note of $7,500, Wild said that if he was allowed to continue business he would pay the $11,000 note, but if he was prosecuted on these old notes he would not be able to pay any of his old debts, and he further stated that he was obligated to others for current expenses. Wild was very largely indebted. The National Union Bank of Kinderhook, the National Bank of Kinderhook, the testator, and others, held notes against him, some of which were indorsed by his wife, and all of which were accommodation loans. It was necessary for Wild to pay his current bills, to maintain his ability to purchase supplies for his mill and retain his help. Wild was sworn as a witness on this trial, and stated that he could not have continued business if an action had been brought against him on this $11,000 note. He further stated that, in case of suit on any of the old notes, he would have been obliged to have gone down, or to have protected himself. The executors consulted the re-

siduary legatees, and were advised by them that they had better do
the best they could with the Wild note, and get all they could from
him, and that there was no use trying to get anything from him by
suit, or go to any expense. They were advised by their counsel that
a suit against Wild and his wife would be disastrous, and that it was
unwise to bring an action against them on the indebtedness. They
also advised with others; and the cashier of the National Union Bank
of Kinderhook, where the note indorsed by the testator and other
notes were held against Wild, told them that it would not do any good
to sue Wild; that they could not collect. Theodore Snyder, one of
the residuary legatees, and the person under whom the appellants
claim herein, was a lawyer of experience, and lived at Kinderhook. In
August or September, 1886, one of the executors went with one of the
residuary legatees, and talked with Theodore Snyder in regard to the
Wild and Raeder notes (Raeder notes hereinafter mentioned); and, in
the course of the conversation, Snyder was asked, "What about the
Wild matter?" to which he said, "Charley Wild is bankrupt, and
couldn't pay his creditors if he tried to. The Union Bank of Kinder-
hook has got him covered all up." He was asked, "What would be
your advice about this matter,—to sue it?" He said, "No, sir; coax
out of them what you can get." Then he was asked, "You would'nt
approve of the executors going on and suing those claims?" (referring
to the Wild and Raeder claims). He said, "No, sir; what would you
get? What would you get?" Again, at the office of the attorney of
the executors, when both of the executors were present, Theodore Sny-
der said that the claims against Wild and Raeder were exceedingly
doubtful,—especially against Wild,—and that it would not do to sue
them. The executors, in the exercise of their judgment, decided not
to sue the $11,000 note. Subsequently, and in November, 1889,
Charles Wild was sued by Henry L. Miller on an accommodation loan,
amounting to several thousand dollars, and, before judgment was ob-
tained thereon, said Wild transferred his property, and nothing was
collected on the judgment so obtained against him. Thereafter, and
in the spring of 1890, the National Bank of Kinderhook sued the said
Charles Wild and Mary A. Wild on an accommodation loan from said
bank amounting to several thousand dollars, and obtained judgment
thereon May 9, 1890. On the 5th day of May, prior to the entry of
said judgment, said Mary A. Wild had so transferred and incumbered
her real and personal property that nothing could be collected on the
judgment as against her, and nothing was ever collected thereon, ex-
cept that the bank, for the purpose of closing up the matter, there-
after sold the judgment to one of the co-defendants, an indorser on
the note upon which the judgment was taken, for the sum of $250.
The inability of Wild to pay the judgments obtained against him was
not by reason of losses occurring after the appointment of the re-
spondents herein; for the evidence shows that in the years 1886 to
1889, inclusive, his business was run at a profit of $20,914.40. It was
said by this court on the former appeal herein:

"To excuse the executors from failing to institute legal proceedings to
collect this note, they were compelled to show on the accounting that the
note could not have been collected had an action been commenced thereon.

It was not enough for them to produce evidence from which we might guess that legal proceedings would have been useless. They should have produced testimony which left no reasonable doubt in that regard."

On the former trial herein the testimony in regard to the conversations with Theodore Snyder, the residuary legatee, under whom the appellants now claim, and the evidence in regard to the bringing of suits against the said Wild and the said Wild and his wife, and the failure to recover on the judgments obtained therein, were not before this court. We think the testimony mentioned, and other testimony received on this trial, change entirely the conclusions to be drawn in regard to the failure of the executors to bring suit on the $11,000 note, and that, on the evidence now before us, the findings of the referee and of the surrogate's court that the executors should not be charged with the amount thereof should be sustained.

At the time of the death of the testator, he held three notes against one John Raeder, amounting in the aggregate to the sum of $8,149.37, on one of which notes, amounting to $3,078, other persons were liable. There were at the same time in the National Union Bank of Kinderhook notes of said John Raeder, indorsed by the testator, amounting to about $10,000. The opinion of this court on the former appeal herein does not refer to the notes of Raeder that were indorsed by the testator, and which were subsequently paid by his executors, but the record and account in regard to the same was the same on the first appeal as it is now. The evidence on the last trial in regard to the Raeder matter does not differ materially from the evidence on the first trial, except that a greater amount of testimony was taken in regard to the same, and greater detail has been entered into relating thereto, and in relation to the extent of the business carried on by said Raeder. At the time of testator's death he held a mortgage of $6,000 on a farm known as the "Fox Hollow Farm," as collateral to the indebtedness held by him against the said Raeder, which mortgage was dated December 9, 1879, but was never recorded. The Fox Hollow farm had a mortgage thereon, given by the said Raeder, antedating said mortgage given to the testator, which mortgage amounted to $3,638.20, and was owned by one Wendover. After the testator's death, the executors had repeated interviews with the said Raeder, and were told by him that if they pressed their claim and sued him thereon, or attempted to get a judgment, they would not get anything, and that the National Union Bank of Kinderhook had a blanket mortgage on all his property. The executors made further inquiry in regard to the said Raeder, and found that his affairs were in bad shape, and his real property covered by mortgages. They had interviews with the legatees, including the said Theodore Snyder, and obtained substantially the same advice from them in regard to the Raeder notes that they had given in regard to the Wild notes. The executors collected from Raeder from time to time, for interest, the sum of $544.69. The National Union Bank of Kinderhook did hold a blanket mortgage covering the real property of the said Raeder, including the said Fox Hollow farm, as collateral to notes of large amount held by said bank against the said Raeder. In December, 1888, Raeder offered

to deed to the executors the Fox Hollow farm, subject to the Wend-over mortgage, and get the National Union Bank of Kinderhook to release its claim thereon, and also to obtain from the other persons liable on the note of $3,078 a new note to the executors for one-half of the principal thereof, namely, $1,500, if the executors would release him from all of the notes included in said amount of $8,149.37, and take up and pay one of the notes indorsed by the testator still remaining unpaid in the said bank, amounting to about the sum of $5,000. The Fox Hollow farm was then considered by the executors, and by others competent to judge in regard to the value of the said farm, to be worth from ten to twelve thousand dollars. They tried to get said Raeder to make a better offer of settlement, but, being unable to do so, decided that it was the only thing they could do; and, upon the advice of counsel, and exercising their best judgment in regard to the same, they accepted a deed of the farm, the mortgage of the bank was released, and the other provisions of the agreement were carried out by each. Raeder still remained liable as maker on a note of about $5,000 owned by said National Union Bank of Kinderhook which he promised to try to pay, and relieve the estate from liability thereon. The executors had obtained another mortgage on property in Delaware county, as collateral to the Raeder indebtedness, on which collateral they realized the sum of $1,300. After the consummation of this settlement, they endeavored to sell the Fox Hollow farm, but were unable to do so. While they held the said farm they rented the same, and collected rents therefrom to the amount of $485.02, and paid out on account of said farm for repairs $259.68, and on account of taxes $20.09, leaving the net amount received by them from said farm while rented by them the sum of $175.25. They advertised the farm for sale, and, being unable to obtain a purchaser therefor, offered it for sale at auction at a time when other property belonging to said estate was being sold, and the only offer they received therefor was $50 in addition to the first mortgage thereon. This was a little more than two years after they had accepted the deed and said settlement had been made. On the 4th day of April, 1891, they sold said farm at private sale to Frank Raeder, a son of said John Raeder; and he paid therefor the sum of $861.80 over and above the first mortgage thereon, and agreed to pay whatever further amount he was able to pay therefor. Subsequently, and within a few months after the transfer of said farm to said Frank Raeder, he paid to said executors amounts which, including said $861.80, aggregate $2,984.05. The payments made by the said Frank Raeder in addition to the said amount of $861.80 seem to have been made by him without any legal obligation on his part to pay the same. The loss of about $8,000 to the estate in connection with the settlement with Raeder was, to quite a large extent, by reason of the depreciation in the value of the Fox Hollow farm, and in the fact that the executors failed to receive for the farm anything like what they had a right to believe they would receive from the same when they took it in settlement as aforesaid. Some effort was made by the executors to ascertain whether the $1,500 note accepted by them as a part of this settlement could not be collected, but they were unable to collect

the same; and after several years said note was sued, and execution issued thereon, which was returned wholly unsatisfied. We are of the opinion that the executors should not be held responsible for the loss on the Raeder notes growing out of the settlement made at the time that the Fox Hollow farm was transferred to them. John Raeder died on the 17th day of January, 1900, not having paid anything on the note indorsed by the testator that remained unpaid in the National Union Bank of Kinderhook. On the 17th day of June, 1891, the note so remaining unpaid, then amounting to $4,928, was paid by the executors to the bank, and retained by them. The payments made by the said Frank Raeder in addition to the $861.80 were paid on account of the farm, and not on account of his father's indebtedness to the estate; and such note, with interest thereon from the 17th day of June, 1891, when the same was paid by the executors, became a valid claim against the estate of John Raeder, deceased. Said John Raeder left a last will and testament, which was admitted to probate; and executors were appointed by the surrogate, and entered upon the discharge of their duties. Said Raeder's estate was finally settled by the surrogate of Columbia county on the 7th day of May, 1892, and the net amount distributed to the creditors of the said Raeder was the sum of $7,944.75. One of the respondents says that he did not know that there was a fund determined to be in the hands of John Raeder at the time of his death, applicable to the payment of his debts, and the other respondent says that he never learned that the said John Raeder left an estate from which a claim could be collected. If the note so paid by the respondents had been properly presented by them to the personal representatives of the said John Raeder, deceased, they would have received their pro rata share of the assets of said estate, which amount would have been the sum of $1,632.51. There is nothing in the record to excuse the respondents for their failure to present such claim against said estate. On the argument herein it was suggested that as Frank Raeder had voluntarily paid to the respondents an amount in excess of the percentage that they would have received from the estate of John Raeder, deceased, the same should be considered a payment to them on account of said estate. There is no evidence herein that at the time of the sale to Frank Raeder of the Fox Hollow farm the respondents transferred to him the claim against his father's estate. At that time the respondents did not own the note, as they had not paid the same to the National Bank of Kinderhook. Frank Raeder was not one of the executors of the will of his father. He was in no way interested in his estate, except as a creditor, and possibly as a legatee under his will. There was no obligation on the part of Frank Raeder to pay the indebtedness of his father. The respondents should have been charged with the amount that they would have received from the estate of John Raeder, deceased, if they had properly presented their claim to said estate, with interest thereon, to the amount of $544.16.

The decree of the surrogate appealed from is modified on the facts and the law by including therein as a charge against the executors

the sum of $2,176.67, and as thus modified affirmed, with costs to the appellants and respondents payable out of the estate. All concur, except EDWARDS, J., not voting.